UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

STACY L. FIELDS,

              Plaintiff,

       v.

NANCY A. BERRYHILL, Acting
Commissioner of Social
Security,

              Defendant.

Case No. EDCV 16-0317-JPR

**MEMORANDUM DECISION AND ORDER AFFIRMING COMMISSIONER**

## I.  PROCEEDINGS

    Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed November 17, 2016, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

1

**II. BACKGROUND**

Plaintiff was born in 1968. (Administrative Record ("AR")
36.) She completed 12th grade and two semesters of college.
(Id.) She worked as a financial-services representative and a
peer facilitator. (AR 37-38.)

On August 9, 2012, Plaintiff applied for DIB, alleging that
she had been unable to work since March 2, 2009,[1] because of
bipolar disorder, "[r]espitory [sic]/[o]xygen complication,"
arthritis, depression, anxiety, spinal stenosis, lower-back and
pelvic-bone pain, asthma, and persistent and uncontrollable
bladder leakage. (AR 78-79.) After her application was denied
initially and on reconsideration, she requested a hearing before
an Administrative Law Judge. (AR 113, 120, 126.) A hearing was
held on July 11, 2014, at which Plaintiff, who was represented by
counsel, testified, as did a vocational expert. (See AR 29-77.)
In a written decision issued August 25, 2014, the ALJ found
Plaintiff not disabled. (AR 6-24.) On September 10, 2014,
Plaintiff sought Appeals Council review (AR 5), which was denied
on December 18, 2015 (AR 1-3). This action followed.

---

[1] In her Application Summary, Plaintiff alleged an onset
date of March 1, 2009. (AR 170.) The ALJ used March 2, 2009, as
the onset date. (AR 9.) The parties refer to both dates in
their Joint Stipulation. (See J. Stip. at 2-3.) Because the ALJ
applied res judicata based on previous agency denials of
Plaintiff's apparently similar applications for disability
benefits and found that as a result she was ineligible for
benefits before May 21, 2011 (AR 9), a finding she does not
challenge, the exact onset date does not matter.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

3

1      A.   The Five-Step Evaluation Process

2      The ALJ follows a five-step evaluation process to assess

3 whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4);

4 Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as

5 amended Apr. 9, 1996).  In the first step, the Commissioner must

6 determine whether the claimant is currently engaged in

7 substantial gainful activity; if so, the claimant is not disabled

8 and the claim must be denied.  § 404.1520(a)(4)(i).

9      If the claimant is not engaged in substantial gainful

10 activity, the second step requires the Commissioner to determine

11 whether the claimant has a "severe" impairment or combination of

12 impairments significantly limiting her ability to do basic work

13 activities; if not, the claimant is not disabled and the claim

14 must be denied.  § 404.1520(a)(4)(ii).

15      If the claimant has a "severe" impairment or combination of

16 impairments, the third step requires the Commissioner to

17 determine whether the impairment or combination of impairments

18 meets or equals an impairment in the Listing of Impairments at 20

19 C.F.R. part 404, subpart P, appendix 1; if so, disability is

20 conclusively presumed.  § 404.1520(a)(4)(iii).

21      If the claimant's impairment or combination of impairments

22 does not meet or equal an impairment in the Listing, the fourth

23 step requires the Commissioner to determine whether the claimant

24 has sufficient RFC to perform her past work; if so, she is not

25 disabled and the claim must be denied.  § 404.1520(a)(4)(iv).

26 The claimant has the burden of proving she is unable to perform

27 past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant

28 meets that burden, a prima facie case of disability is

established.  Id.  If that happens or if the claimant has no past
relevant work, the Commissioner then bears the burden of
establishing that the claimant is not disabled because she can
perform other substantial gainful work available in the national
economy.  § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257.  That
determination comprises the fifth and final step in the
sequential analysis.  § 404.1520(a)(4)(v); Lester, 81 F.3d at 828
n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since March 2, 2009, the alleged
onset date.  (AR 11.)  At step two, he concluded that Plaintiff
had severe impairments of degenerative joint disease of the
lumbar spine, degenerative disc disease of the lumbar spine at
L5-S1, bilateral patellofemoral syndrome, thoracic myofascial
strain, asthma, obesity, possible fibromyalgia, history of
gastric bypass surgery with chronic anemia, and bipolar disorder.
(AR 12.)  At step three, he determined that her impairments did
not meet or equal a listing.  (Id.)

At step four, the ALJ found that Plaintiff had the RFC to
perform light work except that she could not climb ladders,
ropes, or scaffolds; could no more than frequently kneel, crouch,
crawl, balance, or be exposed to extreme heat or wetness; could
no more than occasionally stoop, climb ramps and stairs, be
exposed to workplace hazards and pulmonary irritants, or interact
with the public; was limited to no more than occasional changes
in her workplace setting; and was precluded from performing
complex work activity.  (AR 13-14.)  The ALJ found that Plaintiff

5

was "likely to be absent from the workplace about one day a month." (AR 14.)

Based on the VE's testimony, the ALJ concluded that Plaintiff could not perform her past relevant work. (AR 22-23.) At step five, he relied on the VE's testimony to find that given Plaintiff's RFC for light work "impeded by additional limitations," she could perform three "representative" light, unskilled occupations in the national economy. (AR 23-24.) Accordingly, he found Plaintiff not disabled. (AR 24.)

**V.   DISCUSSION**

Plaintiff alleges that the ALJ improperly rejected the opinion of treating psychiatrist Dr. Staci Johnson that she would not be able to "adapt to new or stressful situations" or "complete a 40-hour workweek without decompensating." (J. Stip. at 5.)  She does not challenge any of the ALJ's other findings or conclusions.  For the reasons discussed below, remand is not warranted.

A.   Applicable Law

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither.  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  Id.

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a

6

treating physician's opinion is well supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in the
record, it should be given controlling weight. § 404.1527(c)(2).
If a treating physician's opinion is not given controlling
weight, its weight is determined by length of the treatment
relationship, frequency of examination, nature and extent of the
treatment relationship, amount of evidence supporting the
opinion, consistency with the record as a whole, the doctor's
area of specialization, and other factors. § 404.1527(c)(2)-(6).

When a treating physician's opinion is not contradicted by
other evidence in the record, it may be rejected only for "clear
and convincing" reasons. See Carmickle v. Comm'r, Soc. Sec.
Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81
F.3d at 830-31). When it is contradicted, the ALJ must provide
only "specific and legitimate reasons" for discounting it. Id.
(citing Lester, 81 F.3d at 830-31). Furthermore, "[t]he ALJ need
not accept the opinion of any physician, including a treating
physician, if that opinion is brief, conclusory, and inadequately
supported by clinical findings." Thomas v. Barnhart, 278 F.3d
947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec.
Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

  B.  Relevant Background

On June 18, 2009, state-agency medical consultant Dr. Nara
A. Paculdo, a psychiatrist, completed a psychiatric evaluation.[2]

---

[2] Because Plaintiff did not file her current DIB application
until 2012, Dr. Paculdo's consultative examination must have been
(continued...)

7

(AR 256-60.)  Plaintiff reported that she was sad, depressed, and anxious.  (AR 256.)  She stated that she "was not able to work because there were too many people around and she did not want to talk to anyone."  (AR 257.)  She could not concentrate.  (Id.) She was able to cook, clean, run errands, shop, and take her children to school.  (AR 258.)  In a mental-status examination, Plaintiff had "unimpaired" memory and "intact" concentration. (AR 258-59.)  Dr. Paculdo diagnosed anxiety and depressive disorders.  (AR 259.)  Dr. Paculdo found that Plaintiff's ability to understand, remember, and carry out simple or complex job instructions was not significantly limited.  (Id.)  Her ability to relate and interact with supervisors, coworkers, and the public was not significantly impaired.  (Id.)  She was not significantly limited in her ability to maintain concentration and persistence for a normal work period and to withstand the stress and pressures associated with an eight-hour workday.  (AR 259-60.)  Dr. Paculdo found that her prognosis was "good" and she was "able to return to the national labor force from a psychiatric point of view."  (AR 260.)

On May 5, 2011, state-agency consultant Dr. Reynaldo Abejuela, a specialist in psychiatry and neurology, competed a psychiatric evaluation.[3]  (AR 1147-54.)  Plaintiff complained that she suffered from depression, anxiety, and multiple physical ailments.  (AR 1147.)  She reported that she had problems

---

[2] (...continued)
for her earlier DIB claim.

[3] This evaluation also was likely conducted in connection with the earlier DIB claim.

concentrating and focusing but was not seeking psychiatric help
because she could not afford it.[4]  (AR 1148.)  In a mental-status
examination, Plaintiff was cooperative and nonhostile.  (AR
1150.)  Her thought content was logical and coherent, and she
"recalled three out of three objects after three and five
minutes."  (Id.)  The examination revealed "mild depression and
mild anxiety" (AR 1152) and an "occupational and social
functioning impairment of none to mild from the psychiatric
standpoint" (AR 1153).  Plaintiff had "mild mental difficulties"
maintaining social functioning.  (AR 1153.)  She had no mental
restrictions in her daily activities and no repeated episodes of
emotional deterioration in "work-like" situations.  (Id.)  Her
concentration, persistence, and pace were mildly impaired, as
were her responses to coworkers, supervisors, the public, and
usual work situations.  (Id.)  Dr. Abejuela opined that
Plaintiff's symptoms would "abate in the next few months even
without treatment."  (AR 1154.)  Her psychiatric prognosis was
"fair to good."  (Id.)

        Between 2006 and 2011, Plaintiff was treated by Dr.
Elizabeth D. Duenas.  (See AR 383-84 (list of medications
prescribed by Dr. Duenas between 2006 and 2011).)  She was
treated primarily for physical ailments but reported symptoms of
depression and anxiety, which were controlled or improved with
medication.  (See, e.g., AR 408 (Apr. 2009: depression controlled
with medication), 388 (Aug. 2010: mood improved with

---

        [4] Although Plaintiff apparently temporarily lost coverage in
2011, she began receiving Medi-Cal sometime before late 2012.
(See AR 1111.)

medication).)

In a function report dated October 20, 2012, Plaintiff noted that she took care of her 12-year-old daughter but that her other children helped with that task. (AR 229, 236.) She could pay attention for only "maybe a good 2 minutes" before "dozing off." (AR 233.) For the question, "Do you finish what you start?" she checked, "No." (Id.) She noted that she had never been fired or laid off from a job because of problems getting along with other people. (AR 234.) A third-party function report completed by her daughter echoed much of Plaintiff's own report. (See AR 217-25.) She noted that Plaintiff was not able to take care of her younger daughter "at all." (AR 218.)

On December 8, 2012, state-agency consulting psychiatrist Dr. Thaworn Rathana-Nakintara completed a psychiatric evaluation. (AR 1067-71.) Dr. Rathana-Nakintara noted that Plaintiff's chief complaint was "feeling sad and very angry." (AR 1067.) She reported taking medications for her symptoms, which helped. (Id.) In a mental-status examination, Dr. Rathana-Nakintara noted that Plaintiff was alert and oriented to person, place, time, and situation. (AR 1069.) Dr. Rathana-Nakintara tested Plaintiff's memory and noted that she was "able to register 3 out of 3 items" immediately and "3 out of 3 items at 5 minutes." (Id.) Dr. Rathana-Nakintara diagnosed "Mood Disorder" and "Cannabis Dependence, in sustained remission." (AR 1070.) Plaintiff had no difficulty interacting with the clinic staff or the doctor, maintaining focus and attention, or maintaining concentration, persistence, and pace. (Id.) She had no limitations performing simple or complex tasks, performing work

10

activities on a consistent basis without special supervision, "completing a normal workday or work week," accepting instructions from supervisors, or interacting with coworkers and the public. (AR 1070-71.) She was "adhering and responding well to treatment." (AR 1071.) Her prognosis was "good." (Id.)

On December 14, 2012, Dr. B.A. Smith, a state-agency consulting psychiatrist, reviewed Plaintiff's medical records and completed a case analysis. (AR 86-87.) Dr. Smith noted that Plaintiff had one episode of decompensation in June 2012, but no other episodes. (AR 86.) Dr. Smith found that Plaintiff had "no impairment in functioning." (Id.) Plaintiff had "mild" restrictions in her activities of daily living and no difficulty maintaining social functioning and concentration, persistence, or pace. (Id.)

Meanwhile, Plaintiff started seeing Dr. Johnson, her treating psychiatrist, on December 7, 2012. (AR 1091.) Plaintiff's medical records show that she met with Dr. Johnson four times: on December 7, 2012, January 17, 2013, March 14, 2013, and August 2, 2013. (See AR 1091-92 (Dec. 7, 2012 visit), 1096-97 (Jan. 17, 2013 visit), 1097-98 (Mar. 14, 2013 visit), 1136 (Aug. 2, 2013 visit).) Plaintiff had appointments on May 9, June 5, September 27, and November 20, 2013, but she did not show up for them. (AR 1104-05, 1138, 1145.)

On December 7, 2012, Dr. Johnson established a series of treatment goals related to Plaintiff's living arrangements, money management, mental-health management, and medication. (AR 1091-92.) Dr. Johnson completed a psychiatric assessment and diagnosed Plaintiff with bipolar disorder. (AR 1116-18.) She

11

assigned Plaintiff a "current" global assessment of functioning

("GAF") score of 55 and noted that Plaintiff's highest GAF score

during the past year was 61.[5]  (AR 1116.)  Plaintiff complained

of "depression/anxiety, mood instability, irritability, poor

sleep, [and] manic symptoms."  (Id.)  In a mental-status

examination, Plaintiff's mood was "anxious," but she had "good"

concentration and "intact" short- and long-term memory, and she

was oriented to person, place, purpose, and time.  (AR 1118.)

Plaintiff reported a good response to medication; Dr. Johnson

recommended adjusting her medications and stressed the importance

of medication compliance.  (Id.)  Plaintiff was also assessed by

Cynthia Marez, a social worker, the same day.  (See AR 1106-15,

1131.)  Marez diagnosed bipolar and anxiety disorders and

assigned Plaintiff a GAF score of 49.  (AR 1106.)

On January 17, 2013, Dr. Johnson noted Plaintiff's symptoms

of "depression/anxiety, mood instability, poor sleep, [and] manic

symptoms."  (AR 1096.)  In a mental-status examination,

Plaintiff's affect was "anxious [but] congruent" and her

attention and concentration were "fair."  (Id.)  Dr. Johnson

---

[5] GAF scores assess a person's overall psychological
functioning on a scale of 1 to 100.  See Diagnostic and
Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000).
A GAF score of 51 to 60 indicates moderate symptoms or difficulty
in social, occupational, or school functioning.  See DSM-IV 34.
A GAF score of 61 to 70 indicates "some mild symptoms (e.g.,
depressed mood and mild insomnia) OR some difficulty in social,
occupational, or school functioning . . . but generally
functioning pretty well, has some meaningful interpersonal
relationships."  DSM-IV 34.  GAF scores have been excluded from
the latest edition of DSM because of concerns about their
reliability and lack of clarity, however.  See DSM-V 15-16 (5th
ed. 2013).

12

recommended that Plaintiff continue with her current medications but with revised dosages. (AR 1097.) On March 14, 2013, Plaintiff reported to Dr. Johnson that she was "ok" and had a "good response to [her] current medications," but she admitted to "some anxiety" and "attribute[d] it to being newly diagnosed with fibromyalgia and being told that [she] no longer ha[d] lupus." (Id.) In a mental-status examination, she was able to concentrate and presented as appropriate or normal in all tested areas. (AR 1098.) She reported a "good response to medication," and her affect apparently improved to "neutral, congruent." (Id.)

Dr. Johnson completed a "Narrative Report" on May 16, 2013. (AR 1090.) The report was a one-page preprinted form that listed potential diagnostic criteria, symptoms, and other information and had blank spaces for diagnoses, prescribed medications, and comments. (Id.) Dr. Johnson diagnosed bipolar disorder. (Id.) In a section asking Dr. Johnson to circle the "criteria that apply" to Plaintiff, she noted that Plaintiff's thought was "ruminative," her memory was "intact," her judgment was mildly impaired, and she showed evidence of insomnia, depression, anxiety, compulsive behavior, and "manic syndrome." (Id.) She did not circle "confusion," "phobias," "panic episodes," "suicidal/homicidal ideation," "decreased energy," "isolation," or "inappropriate affect." (Id.) Dr. Johnson wrote "N/A" next to "psychosis." (Id.) She circled "anxious" to describe Plaintiff's attitude — but not "hostile," "uncooperative," "fearful," or "tearful" — and "chronic" as her prognosis. (Id.) Dr. Johnson assessed that Plaintiff could "interact

13

appropriately" with family, strangers, coworkers, and
supervisors. (<u>Id.</u>) She could maintain a sustained level of
concentration and sustain repetitive tasks for an extended
period, but she could not "adapt to new or stressful situations."
(<u>Id.</u>) For the question, "Can [Plaintiff] complete [a] 40 hr.
work week without decompensating?" Dr. Johnson circled, "no."
(<u>Id.</u>) Dr. Johnson left the comment section blank. (<u>Id.</u>)

On August 2, 2013, Plaintiff reported feeling "not so good."
(AR 1136.) She noted that her medications "were effective" but
that she "ran out" of them because she missed an appointment.
(<u>Id.</u>) In a mental-status examination that day, Dr. Johnson noted
that Plaintiff was anxious but able to concentrate. (<u>Id.</u>)

Meanwhile, on June 28, 2013, state-agency consultant Dr.
Raman Gill Chahal[6] completed the mental-health portion of
Plaintiff's case analysis on reconsideration. (AR 102-04.) Dr.
Chahal found that Plaintiff had "moderate" difficulty maintaining
social functioning, concentration, persistence, or pace. (AR
103.) He agreed with Dr. Smith's assessment that she had "mild"
restrictions in her activities of daily living and no repeated
episodes of decompensation of extended duration. (<u>Id.</u>) Dr.
Chahal found that Plaintiff's subjective complaints were not
supported by the objective medical evidence. (AR 104.) He found
that there was an "[i]ssue of credibility" because of
"inconsistent" reports of symptoms and history. (<u>Id.</u>) He noted

---

[6] Dr. Chahal has a specialty code of "37" (AR 104),
indicating "[p]sychiatry," <u>see</u> Program Operations Manual System
DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), http://
policy.ssa.gov/poms.nsf/lnx/0424501004.

14

that she "reports difficulties in social interaction but interacts appropriately with various [treatment] providers and their staff." (Id.)

In a mental-RFC assessment, Dr. Chahal opined that Plaintiff could maintain concentration and persistence "on detailed tasks for 2 hour periods and on simple tasks for 4 hour intervals to complete a workday/[week] on a sustained basis." (AR 108.) She was "moderately limited" in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Id.) She had no limitations in "understanding and memory" and no significant limitations in the areas of "sustained concentration and persistence." (Id.) Dr. Chahal found that Plaintiff had moderate limitations in her ability to interact appropriately with the general public but had no other significant limitations in the area of social interaction. (AR 109.) Because of her depression, anxiety, and the "psychological impact of chronic pain and fatigue," Plaintiff "may have difficulties in serving the general public," but she could "interact in a superficial work related manner with coworkers and supervisors." (Id.) Dr. Chahal found that although Plaintiff was "moderately limited" in her ability to respond appropriately to changes in the work setting, she had no other significant "adaptation" limitations, and she could adapt to "occasional changes in her work setting and routine." (Id.)

At the July 11, 2014 hearing, Plaintiff testified that she was diagnosed with bipolar disorder in 2003. (AR 47.) She reported that she has "very short patience" and that her "anxiety levels run extremely high." (Id.) She testified that she had difficulty interacting with the public (AR 52), was "stand-offish" with coworkers (AR 53), and would not be able to get along with supervisors (id.). She had problems focusing and paying attention. (Id.)

C. <u>Analysis</u>

The ALJ found that Plaintiff was able to perform light work with certain postural and exposure limitations, was limited to no more than occasional changes in workplace setting, could no more than occasionally interact with the public, and was precluded from performing complex workplace activity. (AR 13-14.) The ALJ found that Plaintiff was "likely to be absent from the workplace about one day a month." (AR 14.) He considered Plaintiff's statements and Adult Function Report and concluded that they were only partially credible. (AR 15-16.) He considered the Third Party Function Report completed by Plaintiff's daughter and found it not credible. (AR 16-17.)[7] He summarized the medical opinions of the state-agency consultants, consultative examiners, and Dr. Johnson. (AR 17-22.) As to Plaintiff's alleged mental impairment, he accorded "great weight" to the opinions of state-agency doctors Smith, Chahal, and Abejuela and "little weight" to

---

[7] Plaintiff has not challenged the ALJ's assessment of her credibility or his rejection of the third-party report.

the opinions of Drs. Rathana-Nakintara and Johnson. (AR 21-22.)
Because Dr. Johnson's opinion that Plaintiff would not be able to
adapt to new or stressful situations or complete a 40-hour
workweek without decompensating was contradicted by other medical
opinions in the record, the ALJ had to give only specific and
legitimate reasons for rejecting all or part of it. See
Carmickle, 533 F.3d at 1164. As discussed below, the ALJ did so.

As an initial matter, the ALJ partially accommodated Dr.
Johnson's finding that Plaintiff could not adapt to new or
stressful situations by limiting her to only occasional changes
in the workplace. But in any event, he provided specific and
legitimate reasons for rejecting the opinion to the extent he did
so.

The ALJ gave "little weight" to Dr. Johnson's opinion in
part because it was "brief, conclusory, and inadequately
supported by clinical findings." (AR 21.) Indeed, the opinion
was rendered on a one-page preprinted form that listed potential
diagnostic criteria, symptoms, and other information and provided
blank spaces for diagnoses, prescribed medications, and comments.
(See AR 1090.) Dr. Johnson simply circled "no" in response to
the question, "Can [Plaintiff] complete [a] 40 hr. work week
without decompensating?" (Id.) She did not provide any
explanation for that finding or her finding that Plaintiff could
not adapt to new or stressful situations, also in response to a
preprinted form question. (See id.) The ALJ was entitled to
discount the opinion on that basis. See Crane v. Shalala, 76
F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected
psychological evaluations "because they were check-off reports

17

that did not contain any explanation of the bases of their

conclusions"); De Guzman v. Astrue, 343 F. App'x 201, 209 (9th

Cir. 2009) (ALJ was "free to reject" doctor's check-off report

that did not explain basis for conclusions); see also Batson, 359

F.3d at 1195 ("[A]n ALJ may discredit treating physicians'

opinions that are conclusory, brief, and unsupported by the

record as a whole . . . or by objective medical findings[.]").

The ALJ found that Dr. Johnson's opinion was not supported

by "medically acceptable clinical findings." (AR 22.) Indeed,

Dr. Johnson's opinion that Plaintiff would not be able to adapt

to new or stressful situations or complete a 40-hour workweek was

not supported by any clinical findings — either in Dr. Johnson's

own treatment notes, contrary to Plaintiff's argument otherwise

(see J. Stip. at 7-8), or the rest of the record.

As the ALJ noted, Dr. Johnson's opinion was contradicted by

Plaintiff's "grossly normal" mental-status examinations and was

internally inconsistent. (AR 22.) In a December 2012 mental-

status examination, Plaintiff presented as anxious but had "good"

concentration and "intact" memory and was oriented to person,

place, purpose, and time. (AR 1118.) In a mental-status

examination from January 2013, Plaintiff's mood and affect were

"appropriate," her affect was "anxious," and her attention and

concentration were "fair." (AR 1096.) In a May 2013

examination, she was "[a]ble to [c]oncentrate" and presented as

appropriate or normal in all testing areas. (AR 1098.) In an

August 2013 examination, Plaintiff was anxious but able to

concentrate. (AR 1136.) The ALJ was permitted to discount Dr.

Johnson's opinion because it was inconsistent with her own

18

mental-status examination findings. (AR 22); see <u>Rollins v.</u>
<u>Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly
rejected treating physician's opinion when opinion was
contradicted by or inconsistent with treatment reports). Dr.
Johnson also consistently noted that Plaintiff's medications were
mostly effective, and she did not recommend any more intensive or
invasive treatment. (<u>See, e.g.</u>, AR 1136 (noting medications were
effective), 1118 (noting good response to medication), 1098
(same), 1097 (same).) The ALJ properly relied on the apparent
lack of consistent treatment history and examination findings to
discount Dr. Johnson's opinion. See <u>Connett v. Barnhart</u>, 340
F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion
properly rejected when treatment notes "provide[d] no basis for
the functional restrictions he opined should be imposed on
[plaintiff]"). Further, the ALJ noted that Dr. Johnson's opinion
was internally "inconsistent." (AR 22.) Indeed, Dr. Johnson
noted that Plaintiff could maintain a sustained level of
concentration, sustain repetitive tasks for an extended period,
and interact appropriately with others (AR 1090), which is
inconsistent with her opinion that Plaintiff could not complete a
40-hour workweek without decompensating — at least absent some
explanation of why not.[8]

---

[8] Plaintiff argues that POMS DI 25020.010 ¶ 2 contains an
"implicit" acknowledgment that the "ability to adapt to new or
stressful situations" and "complete a 40-hour workweek" are
"separate and distinct work requirements" from "maintaining
concentration," "sustaining performance of repetitive tasks," and
"interacting appropriately with others." (J. Stip. at 10.)
Assuming Plaintiff means POMS DI 25020.010 B.2, which lists the
(continued...)

Further, there is no evidence in the rest of the medical record to support a finding that Plaintiff would be unable to adapt to new or stressful situations or complete a normal workweek without decompensating. Dr. Paculdo found that Plaintiff was not significantly limited in her ability to maintain concentration and persistence for a normal work period and to withstand the stress and pressures associated with an eight-hour workday. (AR 259-60.) Dr. Abejuela opined that Plaintiff had no repeated episodes of emotional deterioration in worklike situations and that her concentration, persistence, and pace were only mildly impaired. (AR 1153.) Dr. Duenas noted improvement in Plaintiff's anxiety and depression with the use of medication. (AR 388, 408.) Dr. Smith noted that Plaintiff had no repeated episodes of decompensation of extended duration. (AR 86.) Dr. Chahal opined that Plaintiff could maintain concentration and persistence on detailed tasks for two-hour periods and on simple tasks for four-hour intervals and could

---

[8] (...continued)
"Mental Abilities Needed For Any Job," her argument is without merit. Notably, the ability to "complete a 40-hour workweek" without decompensating — or, in other words, without "interruptions from psychologically based symptoms" — appears in the same sentence as the ability to "perform at a consistent pace without an unreasonable number and length of rest periods," as a single functional requirement. See POMS DI 25020.010 B.2.a. Thus, the ALJ properly noted the inconsistency in Dr. Johnson's findings that Plaintiff could not work a 40-hour workweek without decompensating yet was able to maintain a sustained level of concentration without any limitations. (AR 22.) And although "the ability to respond appropriately to changes in (a routine) work setting" is listed as a separate requirement to consider, the ability to deal with "new or stressful" situations is not. Id.

complete a workday or week on a sustained basis.[9] (AR 108.) The
ALJ could permissibly reject Dr. Johnson's contrary opinion. <u>See</u>
<u>Batson</u>, 359 F.3d at 1195.

The ALJ noted that Plaintiff "reported decreased symptoms
with prescription medication." (AR 22.) As discussed above,
Drs. Duenas and Johnson both noted improvement in Plaintiff's
symptoms with use of medication. Improvement with treatment and
medication can be substantial evidence supporting an ALJ's
nondisability determination. <u>See</u> <u>Warre v. Comm'r of Soc. Sec.</u>
<u>Admin.</u>, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that
can be controlled effectively with medication are not disabling
for the purpose of determining eligibility for . . . benefits.");
<u>Thomas</u>, 278 F.3d at 957; <u>Allen v. Comm'r of Soc. Sec.</u>, 498 F.
App'x 696, 697 (9th Cir. 2012). And because Plaintiff's symptoms
were largely controlled with medication, she would be able to
work without decompensating, contrary to Dr. Johnson's opinion.

Further, the ALJ properly gave no weight to Dr. Johnson's
conclusion that Plaintiff was unable to work because it was "an
opinion on an issue reserved to the Commissioner." (AR 21.)
Indeed, Dr. Johnson's opinion that Plaintiff was unable to
complete a 40-hour workweek without decompensating was
essentially an opinion on Plaintiff's ultimate disability status,

---

[9] Dr. Rathana-Nakintara similarly found that Plaintiff could
complete a normal workday or week without decompensating (<u>see</u> AR
1070-71), although the ALJ gave the doctor's opinion "little
weight," apparently because it assessed no limitations of any
kind (AR 21).

which the ALJ was not obligated to accept.[10]  <u>See</u>
§ 404.1527(d)(1) ("A statement by a medical source that you are
'disabled' or 'unable to work' does not mean that we will
determine that you are disabled."); SSR 96-5p, 1996 WL 374183, at
*5 (July 2, 1996) (treating-source opinions that person is
disabled or unable to work "can never be entitled to controlling
weight or given special significance"); <u>see also</u> <u>McLeod v.</u>
<u>Astrue</u>, 640 F.3d 881, 885 (9th Cir. 2011) (as amended) ("A
disability is an administrative determination of how an
impairment, in relation to education, age, technological,
economic, and social factors, affects ability to engage in
gainful activity.").  To the extent Dr. Johnson meant that
Plaintiff was disabled or unable to work, the ALJ properly
discounted her opinion.

    Finally, the ALJ was entitled to rely on the opinion of Dr.
Abejuela, which he gave "great weight." (AR 21.)  Because Dr.
Abejuela personally observed and examined Plaintiff and his
findings were consistent with the objective evidence, his opinion
constitutes substantial evidence supporting the ALJ's decision.
<u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001)
(finding that examining physician's "opinion alone constitutes
substantial evidence, because it rests on his own independent
examination of [plaintiff]"); <u>Andrews v. Shalala</u>, 53 F.3d 1035,
1041 (9th Cir. 1995) (opinion of nontreating source based on
independent clinical findings may itself be substantial

---

    [10] Plaintiff concedes that Dr. Johnson "effectively opined
that [Plaintiff] would be incapable of working a 40-hour
workweek." (J. Stip. at 5.)

22

evidence).

Plaintiff argues that she was assessed with a GAF of 49, "indicat[ing] serious symptoms." (J. Stip. at 7.) But the report cited by Plaintiff to support that argument is from a social worker, not an acceptable medical source. (AR 1107-09); see SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("licensed clinical social workers" are not acceptable medical sources). Further, the lower GAF score was contradicted by Dr. Johnson, who assigned Plaintiff a GAF score of 55 the very same day. (AR 1106, 1116.) The higher GAF score assessed by Dr. Johnson as well as the weight of the contrary medical evidence in the rest of the record was a germane reason to discount social-worker Marez's assessment. See Fentress v. Colvin, No. 3:13-cv-05078-KLS, 2014 WL 1116780, at *4 (W.D. Wash. Mar. 20, 2014) (ALJ properly rejected opinion of nonacceptable medical sources because record contained "little if any objective clinical support for the level of functional restriction they assessed"); cf. Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("[i]nconsistency with medical evidence" is germane reason for discounting lay opinion).

Because the ALJ provided specific and legitimate reasons for giving Dr. Johnson's opinion limited weight, remand is not warranted.

## VI.  CONCLUSION

Consistent with the foregoing, and under sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: April 21, 2017

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[11] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."